UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DIANE MARIE EASTERLING,

        Plaintiff,

vs.                                                                    CIVIL NO.: 05-CV-72887-DT

COMMISSIONER OF                              HON. MARIANNE O. BATTANI
SOCIAL SECURITY,                                MAG. JUDGE WALLACE CAPEL, JR.

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I.**      **RECOMMENDATION**

      It is recommended that the Court grant Plaintiff's Motion for Summary Judgment in part, deny Defendant's Motion for Summary Judgment, and remand this case for proceedings consistent with this Report.

**II.**      **REPORT**

      This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB]. Plaintiff filed for benefits on May 29, 2002, alleging that she has been disabled and unable to work since December 18, 2001, due to Reflex Sympathetic Dystrophy Syndrome [RSDS] or Chronic Regional Pain Syndrome [CRPS].[1] (TR 39-41, 51). The Social Security Administration [SSA] denied benefits initially on August 6, 2002. (TR 25-29). A de novo hearing was held on May 11, 2004, before Administrative Law Judge [ALJ] Douglas N. Jones. (TR 172-209). In a decision dated September 9, 2004, the ALJ found that

---

[1]According to SSR 03-2p, RSDS and CRPS are synonymous. (TR 161).

1

Plaintiff could perform some sedentary work. (TR 19-21). Accordingly, Plaintiff was found not disabled. (TR 21). Plaintiff then made this appeal to district court.

### A.    <u>PLAINTIFF'S TESTIMONY</u>

Plaintiff testified that she was born February 21, 1959. (TR 176). She testified that she has lived in a house in Swartz Creek, Michigan for the past twenty-two years. (TR 175-76). She stated that her home is two stories and has a basement. (TR 176). She indicated that she has lived alone for the past ten years. <u>Id.</u>

Plaintiff stated that she finished high school in 1977 and obtained her associates degree in nursing in 1986, for which she still maintains a license. <u>Id.</u> She indicated that she is five feet, four inches tall and weighs 215 pounds. (TR 177).

She stated that she is not currently employed and that she last worked December 18, 2001. <u>Id.</u> She explained that money she received in 2002 from Hurley Medical Center was for work done during the previous year. (TR 177-78). She stated that she has not received any sort of unemployment benefits, worker's compensation, private insurance, pension benefits, or sick pay. (TR 178). However, she stated that she receives benefits from the Family Independence Agency in the form of 141 dollars in food stamps per month, but no cash benefits from same. <u>Id.</u> Further, she stated that she still has BlueCross BlueShield insurance through her previous employer. (TR 179). She stated that her parents have helped her out, and she has also collected empty bottles to support herself. (TR 178).

Plaintiff stated that she still has a driver's license, which expires in 2007. (TR 179). She stated that she drives five to six times a week: twice a week to church, grocery shopping, and on personal errands to Walmart, etc. (TR 180). Plaintiff stated that she has not been on vacation in the last two years, but she did visit her doctor in Vero Beach, Florida in 2002. <u>Id.</u> She explained that her brother and father drove her there and she flew back. <u>Id.</u> She stated that she has not been able to find a

2

primary care physician in Michigan.  (TR 181),  She stated that she last saw Dr. Skullfield in Michigan in 2001, but he no longer wanted to treat her.  Id.  She explained that this is why she is treating with Dr. Hooshmand, a specialist in Florida.  Id.  She stated that her insurance does not require referrals. Id.  She stated that she also sees Dr. Lininger in Waterford, an RSD specialist that overlooks her treatment in Michigan.  (TR 182, 191).

Plaintiff stated that she has worked as an LPN and RN, but the last two years of her employment were as a hospital clerk.  (TR 182-83).  She stated that she would pull tabs and dividers from files and also did limited computer work near the end of her employment.   (TR 183).

Plaintiff explained that her medical problems began in 1990, after a slip and fall injury in December 1989.  (TR 183-84).  She stated that she fell on ice and hit the cement injuring her left knee. (TR 184).  Initially, her left knee hurt for two weeks and bruised, but seemed to heal.  Id.  However, Plaintiff explained that she began experiencing a burning sensation in February of 1990 in her left knee and left leg.  Id.  She stated that three or four months later she noticed a "knot" on the left side of her knee.  Id.

She showed Dr. Burton, with whom she worked at the time with in surgery, and he indicated that it was a "bursa."  (TR 185).   She then had fluid removed from her knee and was administered Depo-Medrol, but the swelling came back and the pain continued.  Id.  In addition, Plaintiff began experiencing muscle spasms.  Id.

She stated that she was still working as a nurse during this time and stopped working after her first surgery in 1991, for five months.  Id.  She was still having severe pain when she returned to work as well as stiffness and limited mobility.   (TR 185-86).  Dr. Burton performed arthroscopic surgery on her in June 1992, and she was off work for eight months.  (TR 186)  She returned on a part-time basis, working four hours, five days a week.  Id.  She stated that although Dr. Burton performed

3

orthopedic surgery on her in 1991 and 1992, she has not seen him recently for treatment.  (TR 182).

She was then given a sit-down nursing job, checking immunization records,  from 1995 to 1999. (TR 186).  She stated that she never returned to full-time work.  (TR 187).  She stated that she then worked in the pediatric clinic doing paperwork.  Id.  However, she was not using a computer in either of the nursing positions.  (TR 187-88).  In pediatrics she checked patient billing and then was responsible for referrals, which involved calling, making appointments, and ensuring that referrals were handled and corrected. (TR 188).  In 1999 she was moved to medical records where she began clerical work and used the computer.  Id.  Plaintiff stated that her condition worsened from 1994 to 1996, but when she was diagnosed and prescribed medication, she stated that she began to improve a little.  Id.  She stated that there was a time when she only worked two four hour days, but then was able to increase to four days a week, four hours each day.  Id.

She stated that her RSD was diagnosed in 1994 at the University of Michigan-Ann Arbor. (TR 188-89).  She stated that at the time she was suffering from severe pain, muscle spasms, and chills.  Id.  She stated that she has been treated for same with about ten lumbar sympathetic blocks at the university hospital.  Id.  She stated that her physician suggested a chemical sympathetctomy, but she refused it and then was denied further treatment.  Id.  She explained that she declined the procedure due to fear of paralysis and loss of bowel and bladder control.  Id.

She then began treating at the Cleveland Clinic, in Cleveland, Ohio, and the McCauley Pain Center.  (TR 190, 203).  She testified that they attempted to diagnose her RSD at the Cleveland Clinic, but the physician did not believe she was suffering from RSD, which led her to the McCauley Pain Clinic.  (TR 190).  She stated that they did more lumbar sympathetic blocks at the pain clinic, which were helpful except for a couple occasions when it caused severe pain and headaches.  Id.

Then, she began treating with her present physician, Dr. Hooshmand.  Id.  She sees him every twelve to eighteen months and in the interim treats with Dr. Lininger.  Id.

Plaintiff stated that she currently has severe pain located on her left side with muscle spasms in her left thigh and calf.  (TR 191-92).  She stated that she also has pain in her left wrist and elbow.  (TR 191).  In addition, she stated that she has "electric shocks that will go up [her] arms and [] legs."  Id.  She stated that her severe muscle spasms also occur once or twice a month to the point her foot curls up and stays in that position.  (TR 192).

She stated that she also suffers from stiffness after sitting too long or after doing any physical work.  Id.  She stated that she has increased difficulty after light housekeeping, dusting, sweeping, and vacuuming.  (TR 192-93).  She stated that she can only do light activity for about thirty minutes before she has to rest.  (TR 193).  She stated that she rests for a half hour or longer depending on her level of pain.  Id.

Plaintiff also testified that she rests each morning, afternoon, and evening by laying down for an hour, depending on how she feels that particular day.  (TR 193-94).   She reported that her overnight sleep is "constantly interrupted."  (TR 194).  She stated that she goes to bed at about eleven or eleven thirty at night and walks up between five and six in the morning.  (TR 195).  If she has pain, she wakes up earlier at around two in the morning.  Id.  She explained that she spends more than six hours in bed because she tries to go back to sleep.  Id.

Plaintiff stated that she walks with a limp and favors one leg.  (TR 196).  She stated that she also stands with her weight over her right leg rather than her left.  Id.  She stated the pain increases and she has severe muscle spasms that limit her mobility.  Id.  She testified that she typically uses a Thermal 4 heating pad to treat severe muscle spasms in the evening, but she also uses it during the day as necessary.  Id.  She stated that she also uses a hot tub at the health spa or an Epsom salt bath

5

at home to treat her pain.  Id.  She then indicated that she also uses the heating pad frequently when she lies down during the day.  Id.  She also takes pain medications, including Ultram and Stadol, which she finds "pretty effective."  (TR 196-97).  Stadol is a nasal spray she uses for pain.  (TR 201-02).  She reported that it does help her pain.  (TR 202).

Plaintiff testified that on a scale of one to ten, with ten requiring a hospital visit, the pain is about a five or a six on a daily basis.  (TR 197).  She indicated that this level of pain exists when she takes her medication and that it varies day to day.  Id.  Further, she stated that changes in the weather make her pain worse, as do hormonal changes, noises, anxiety, depression, cold, heat, and humidity. (TR 197, 201).  She stated that when the weather is warm she feels "pretty good."  (TR 201).  She stated that when she is upset, she becomes depressed and anxious, and this contributes to her pain.  Id. She stated that she saw a mental health care professional in 1994 or 1995 at the MacCauley Center, but has not returned for treatment since that time.  (TR 202).

She stated that when the pain is at a "ten-plus" it is "burning consistently" and she gets restless, irritable and moody.  (TR 197-98).  She stated that she experiences pain at the level of "ten-plus" once a week or more, and she cannot sustain any activity on those days.  (TR 198).  She stated that she does whatever she can to try to calm down the pain on such a day, including lying down with her heating pad, as well as soaking.  Id.  She stated that this has been the case since about 1994.  (TR 199).

Plaintiff testified that she cannot squat, but she can sometimes bend over.  Id.  She stated that she has difficulty carrying anything, especially with her left arm and hand manipulation is difficult because it sometimes causes muscle spasms.  Id.  She stated that grasping is also difficult, and although she does not have these particular problems in her dominant arm, she does have electrical shocks in that arm.  Id.  However, she stated that she still has reasonably good use of the right arm.  Id.

6

She stated that she could possibly return to her past relevant work if she was doing sedentary work not more than four hours a day with resting in between.  (TR 200).

Plaintiff stated that she is borderline hypertensive, but she does not take medication for it.  (TR 200).  She also reported that her medications make her tired, sleepy, and cause her to sweat.  Id.  In addition, the Stadol gives her a bad taste in her mouth.  Id.

Plaintiff reported that although her initial application was denied for failure to cooperate, there was actually a miscommunication.  (TR 202-03).  She explained that she was out of town, and she misplaced the letter from SSA, so she inadvertently missed an appointment that they had scheduled.  (TR 202-03).  She reported that there was never a second visit scheduled by SSA.  (TR 203).

### B.    MEDICAL EVIDENCE

Examination of the parties' cross-motions for summary judgment reveals that an additional recitation of the Plaintiff's medical evidence would be repetitive.  The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[2]

### C.    VOCATIONAL EXPERT'S TESTIMONY

Sharon Princer, a vocational expert [VE], testified at the hearing.  (TR 203-07).  The ALJ presented a hypothetical question to the VE in which a claimant with Plaintiff's age, education (including her Associate's Degree in nursing), and work experience could

> perform only sedentary work that involved only occasional bending at the waist or bending at the knees or kneeling, no crawling, only occasional climbing of stairs, no climbing of stairs, no climbing of ladders, no exposure to unprotected heights or [INAUDIBLE] hazardous, uncovered moving machinery, and no forceful or sustained gripping or grasping with the non-dominant left hand, and no exposure to very hot, excuse me, very cold or very humid temperatures.  I might as well say hot and humid there.  No temperature extremes.

---

[2]See Subpart E, infra, at 9.

7

(TR 204).  The VE testified that under these limitations, Plaintiff would be able to perform her past relevant work as a general office clerk.  (TR 205).  The ALJ asked whether there would be any other work either semiskilled or skilled under the hypothetical.  Id.  The VE testified that the following jobs existed in the region: receptionist, 17,000 positions; admitting clerk, 1,400 positions; and nurse consultant, 4,000 positions.  Id.  Further, the VE stated that the following unskilled jobs also existed under the hypothetical: general clerk, 11,000 positions; administrative support, 3,700 positions; surveillance system monitor, 1,500 positions; and cashier, 14,000 positions.  Id.

The ALJ then asked the VE whether the need "to be unpredictably absent from work or unpredictably unable to complete a work shift," resulting in a loss of about eight hours or one day of work a week, would impact the jobs previously listed.  (TR 205-06).  The VE stated that all work would be precluded by such a limitation.  (TR 206).  The VE also stated that Plaintiff's skills would not transfer to any semiskilled jobs with such a limitation.  Id.

Plaintiff's attorney asked the VE whether the need to recline, meaning "resting and not engaging in any activity . . . for 15 to 20 minutes at a time at will," would affect the previous job listings.  (TR 206-07).  The VE stated that such a need would be work preclusive.  (TR 207).  Plaintiff's counsel then asked whether the an "extreme impairment in concentration, attention, and/or performance in a work setting due to chronic pain, fatigue, and the side effects of medication" would preclude work.  Id.  The VE answered affirmatively.  Id.

8

### D.   **ALJ'S CONCLUSIONS**

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ stated that "[t]he claimant's documented impairments,[3] including her left arm, shoulder and wrist symptoms, and hypertension,"   impairments that are severe within the meaning of the Regulations" but that she does not have an impairment or combination of impairments set forth in Appendix 1, Subpart P, Regulations No. 4.  (TR 18, 20).  The ALJ found Plaintiff's testimony not to be credible.  (TR 19-20).  He determined that Plaintiff had the RFC to perform some of her past relevant work and thus concluded that Plaintiff is not eligible for disability.  (TR 20-21).

### E.   **ANALYSIS**

Plaintiff advances several claims in her Motion for Summary Judgment.  Plaintiff's Motion argues that the ALJ's decision is not supported by substantial record evidence because (1) the ALJ failed to defer to the treating physician, Dr. Lininger's opinion; (2) the ALJ improperly assessed credibility; and (3) the ALJ's questions to the VE did not accurately reflect Plaintiff's RFC.[4]   In

---

[3]It is not entirely clear whether the ALJ considered all of the following documented impairments severe.  Specifically, the ALJ found that

> [t]he medical evidence documents the presence of impairments best described as: degenerative joint disease of the left knee status post resection of prepatellar bursa (1991) and diagnostic arthroscopy (1992); trochanteric bursitis in the left hip; chronic reflex sympathetic disorder in the left lower leg; exogenous obesity, left upper extremity symptoms sometimes described as "complex regional pain syndrome (Exhibits 2F and 4F), and anxiety and depression.  "Regional pain syndrome" is a diagnosis that is sometimes used to describe reflex sympathetic dystrophy (Exhibit 8F4), but in this instance no documented precipitating factor has been identified and the usual clinical signs (Exhibit 8F6) are not clearly established.

(TR 18).

[4]Plaintiff's Motion for Summary Judgment and Brief filed November 21, 2005 (hereinafter "Plaintiff's Brief") at pages 16-23.

9

response, Defendant's Motion for Summary Judgment contends that these aspects of the ALJ's decision are supported by substantial evidence.[5]   The matter is now ready for decision.

### 1.      Standard of Review

This Court's review of the ALJ's conclusions is limited.  The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial evidence based on the record as a whole.  42 U.S.C. § 405(g) (2006).  Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla of evidence, but less than a preponderance of evidence.  Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989).  This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed.  Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994).  Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986).  Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  Applying these standards, I will analyze each of Plaintiff's claims.

### a.      Treating Physician

Plaintiff argues that the ALJ did not properly defer to her treating physician's, Dr. Lininger's opinion.[6]  This Court is well aware that the medical opinions and diagnoses of treating physicians are entitled to substantial deference, particularly if those opinions are uncontradicted.  King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).

---

[5]Defendant's Motion for Summary Judgment and Brief filed February 8, 2006 (hereinafter "Defendant's Brief") at pages 14-19.

[6]Plaintiff's Brief at pages 17-20.

10

> The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.

Bankston v. Comm'r of Soc. Sec., 127 F. Supp. 2d 820, 824 (E.D. Mich. 2000).  However, such deference is due only if the treating physician's opinion is based on sufficient medical data.  See 20 C.F.R. § 404.1529.  The determination of disability is the prerogative of the Secretary, and not the treating physician.  Kirk v. Sec'y Of Health & Human Servs., 667 F.2d 524, 538 (6th Cir. 1981); Duncan v. Sec'y Of Health & Human Servs., 801 F.2d 847, 855 (6th Cir. 1986); 20 C.F.R. § 404.1527.

An ALJ may choose not defer to a physician's opinion when it is brief, conclusory, or not supported by medically acceptable clinical or laboratory diagnosis techniques.  20 C.F.R. § 404.1527(d)(2).  Accordingly, treating physicians' opinions must be grounded on objective medical evidence, and no deference need be afforded to those opinions if they are simply conclusory. Houston v. Sec'y of Health and Human Servs., 736 F.2d 365, 367 (6th Cir. 1984); Duncan, 801 F.2d at 855 (citing King, 742 F.2d at 973).  In other words, the weight to be given a doctor's opinion by an ALJ will depend on the extent to which it is supported by "specific and complete clinical findings."  Giddings v. Richardson, 480 F.2d 652, 656 (6th Cir. 1973).  See also  Cutlip v. Sec'y of Health and Human Servs., 25 F.3d 284, 287 (6th Cir. 1994) (citing Young v. Sec'y of Health & Human Servs., 925 F.2d 146, 151 (6th Cir. 1990)).

In Wilson v. Comm'r. of Soc. Sec., 378 F.3d 541, 544, (6th Cir. 2004) (citations omitted),[7] the Sixth Circuit found that

---

[7] It is noted that Wilson was decided and filed on August 2, 2004, and the ALJ's decision only on September 9, 2004 (TR 21); thus, the ALJ might not have been aware of the holding at that time.

[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors -- namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion.

The ALJ in this case stated that "[t]he medical opinions of Dr. Lininger (Exhibit 4F4 and 6F) regarding the claimant's condition since 2000 received reduced weight as they are unsupported by objective clinical signs or test result[s] in his own treatment notes or elsewhere in the medical record." (TR 20). However, as Plaintiff points out, this is inconsistent with the aforementioned Wilson test.[8] The ALJ did discuss Dr. Lininger's treatment notes from 2002-2004, earlier in his decision. (TR 17-18). In addition, Dr. Lininger is pain specialist (TR 134) whom Plaintiff saw almost every three months from 2002-2004. (TR 130-34, 137-57). The ALJ recognized that Dr. Lininger was a pain specialist, but failed to note that specialization when he summarily rejected the opinion. Wilson requires this. 378 F.3d at 544.

Further, Plaintiff argues that the opinions of Dr. Burton and Dr. Hooshmand are consistent with Dr. Lininger's opinion.[9] Both doctors opined that Plaintiff suffered from chronic reflex sympathetic dystrophy [CRPS] or reflex sympathetic dysfunction [RSD]. (TR 84, 94-98). Specifically, Dr. Hooshmand stated that "[d]ue to CRPS, she must frequently alternate rest with activity. Because of the chronic fatigue and pain due to CRPS, she is not able to increase her work hours or it would cause a setback on her condition." (TR 84). Although Dr. Burton originally questions Plaintiff's diagnosis of RSD in March 1994 (TR 104), by August 1994 after Plaintiff went

---

[8]Plaintiff's Brief at page 18, 20.

[9]Plaintiff's Brief at page 19-20.

to a pain clinic in Ann Arbor, Dr. Burton found that she did have RSD and continued to diagnose

same from then on.  (TR 94-103).

>Nonetheless, it is possible under <u>Wilson</u> to have harmless error:

>>if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal. Cf. <u>NLRB v. Wyman-Gordon</u>, 394 U.S. 759, 766 n. 6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (plurality opinion) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game"). There is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant. Or perhaps a situation could arise where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation.

<u>Wilson</u>, 378 F.3d at 547.

>Plaintiff alleges that her RSD diagnosis is akin to a fibromyalgia diagnosis because both are

largely based on subjective complaints.[10]  Both parties point out that SSR 03-2p outlines the

diagnosis for RSD.  SSR 03-2p was issued on October 20, 2003, before the ruling in <u>Wilson</u>.  SSR

03-2p states that

>>A diagnosis of RSDS/CRPS requires the presence of complaints of persistent, intense pain that results in impaired mobility of the affected region. The complaints of pain are associated with:
>>• Swelling;
>>• Autonomic instability--seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), skin temperature changes, or abnormal pilomotor erection (gooseflesh);
>>• Abnormal hair or nail growth (growth can be either too slow or too fast);
>>• Osteoporosis; or
>>• Involuntary movements of the affected region of the initial injury.
>>Progression of the clinical disorder is marked by worsening of a previously identified finding, or the manifestation of additional abnormal changes in the skin, nails,

---

[10]Plaintiff's Brief at pages 18-19.

muscles, joints, ligaments, and bones of the affected region. Clinical progression does not necessarily correlate with specific timeframes. Efficacy of treatment must be judged on the basis of the treatment's effect on the pain and whether or not progressive changes continue in the tissues of the affected region.

Reported pain at the site of the injury may be followed by complaints of muscle pain, joint stiffness, restricted mobility, or abnormal hair and nail growth in the affected region. Further, signs of autonomic instability (changes in the color or temperature of the skin and frequent appearance of goose bumps) may develop in the affected region. Osteoporosis may be noted by appropriate medically acceptable imaging techniques. Complaints of pain can further intensify, and can be reported to spread to involve other extremities. Muscle atrophy and contractures can also develop. Persistent clinical progression resulting in muscle atrophy and contractures, or progression of complaints of pain to include other extremities or regions, in spite of appropriate diagnosis and treatment, hallmark a poor prognosis.

2003 WL 22399117, at *2 (Oct. 20, 2003).  Although the case law that Plaintiff cites regarding fibromyalgia might not be on point, it does raise an important argument regarding subjective complaints and diseases based on such complaints.

SSR 03-2p further states that

It should be noted that conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved.  Clarification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources. Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to deference and may be entitled to controlling weight.  If we find that a treating source's medical opinion on the issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator will give it controlling weight.

Id. at *5 (citations omitted).  In addition, the Ruling states that:

For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. Although symptoms alone cannot be the basis for finding a medically determinable

14

impairment, once the existence of a medically determinable impairment has been established, an individual's symptoms and the effect(s) of those symptoms on the individual's ability to function must be considered both in determining impairment severity and in assessing the individual's residual functional capacity (RFC), as appropriate.  If the adjudicator finds that pain or other symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to perform basic work activities, a "severe" impairment must be found to exist.

Id. at *6 (citations omitted).

It appears that the ALJ clearly did not conform with the mandates of Wilson as it interprets § 1527(d)(2) given the summary dismissal on the basis of a lack of objective evidence and testing that might not be found with an ailment such as Plaintiff's.  Credibility becomes central, as SSR 03-2p indicates, and Plaintiff also challenges the ALJ's decision in this regard.

### b.    Credibility

Plaintiff alleges that the ALJ improperly assessed her credibility.[11]  In evaluating subjective complaints of disabling pain, this court looks to see whether there is objective medical evidence of an underlying medical condition, and if so then, 1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, 2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.  McCoy on Behalf of McCoy v. Chater,  81 F.3d 44, 47 (6th Cir. 1995) (quoting Stanley v. Sec'y of Health and Human Servs., 39 F.3d 115, 117 (6th Cir.1994) (citing Jones v. Sec'y of Health and Human Servs., 945 F.2d 1365, 1369 (6th Cir.1991) and quoting Duncan v. Sec'y of Health and Human Servs., 801 F.2d 847, 853 (6th Cir.1986)).

In order to determine disability based on subjective complaints, we look to 20 CFR § 404.1529(c)(3) which lists the following factors:

---

[11]Plaintiff's Brief at pages 20-22.

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

As Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  1996 WL 374186 (Jul. 2, 1996).  See also, Murray v. Comm'r of Soc. Sec., 2004 WL 1765530, at *4 (E.D. Mich., Aug. 3, 2004).

The ALJ specifically discussed Plaintiff's credibility.  (TR 19-20, 23-24). He stated that

[t]he claimant's [sic] alleged that she can perform no sustained work activity because of burning pain in the left side of her body, with occasional severe muscle spasms in the left thigh, calf and foot, and electric shocks that go up both arms and legs that usually produces pain, even with the use of narcotic medication (Stadol), at a level of 5-6 on a scale of 10, and sometimes exceeds 10, aggravated by hormonal changes, hot or cold weather and emotional stress.  She further alleged that these episodes occur about once a week and require her to devote all her energy to managing the pain with heating pads, hot baths and lying down.  These allegations are not, however, fully credible because they are inconsistent with the objective medical evidence, the lack of more aggressive treatment, and the claimant's ordinary activities.  She lives alone, is independent in self-care, and regularly engages in activities that are consistent with exertional demands of sedentary work.  At the hearing, the claimant's gait and station were unremarkable, and her appearance, conduct and demeanor were otherwise inconsistent with limitations that might preclude sustained sedentary work activity.

(TR 19-20).[12]  The undersigned recognizes that

---

[12]It is noted by the undersigned that Plaintiff's physical therapist noted on July 17, 1992, that her "subjective c/o pain are not consistent [sic] with objective findings."  (TR 79).  Nonetheless, this

> after listening to what [Plaintiff] said on the witness stand, observing [her] demeanor, and evaluating that testimony in the light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [Plaintiff] was trying to make [her] symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment.

Gooch v. Sec'y of Health and Human Servs., 833 F.2d 589, 592 (6th Cir. 1987). Further, [t]he "ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference." Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997) (citation omitted).

However, Plaintiff points out that she has a hard time obtaining restful sleep and her daily activities are often interrupted by a need to rest after thirty to sixty minutes of activity.[13]  It bears repeating that Dr. Hooshmand stated that "[d]ue to CRPS, she must frequently alternate rest with activity.  Because of the chronic fatigue and pain due to CRPS, she is not able to increase her work hours or it would cause a setback in her condition."  (TR 84).  The ALJ did state that "Dr. Hooshmand diagnosed complex regional pain syndrome with resultant chronic fatigue syndrome." (TR 17).  The ALJ also noted that Dr. Hooshmand opined "on March 20, 2001 (Exhibit 2F1) that the claimant's regional pain syndrome caused 'chronic fatigue syndrome,' but no particular treatment or follow-up care based on chronic fatigue was provided."  (TR 18).

However, Dr. Lininger consistently noted sleep problems sometimes accompanied by concentration difficulties throughout his treatment of Plaintiff.  (TR 141, 143, 145, 147, 149, 153, 156).  The ALJ mentioned only once that Plaintiff had sleep problems relating to her pain and that was on a visit to Dr. Lininger on September 17, 2002.  (TR 17).  The ALJ neglects to mention that Dr. Lininger also noted sleep difficulties on six other dates.  (TR 141, 143, 145, 147, 149, 153).

---

was approximately nine years prior to the Plaintiff alleged onset of disability, and the ALJ did not mention the note by this physical therapist.

[13]Plaintiff's Brief at page 21.

17

Although an ALJ is not required to discuss each and every piece of evidence, he or she "may not pick and choose the portions of a single report, relying on some and ignoring others, without offering some rationale for his decision." Young v. Comm'r of Soc. Sec., 351 F. Supp. 2d 644, 649 (E.D. Mich. 2004).

Thus, while recognizing the deference due an ALJ's credibility determination, the undersigned finds that the ALJ did not properly review the evidence of record in assessing credibility in terms of fatigue and the need to rest. The ALJ noted that Plaintiff spent time "lying down," but then summarily rejected same stating that in was inconsistent with her lifestyle, but consistent with sedentary work. (TR 19). This is even more concerning because of the questions proposed to the VE as is more fully discussed below.

### c.    Hypothetical

Plaintiff argues that the ALJ relied on VE testimony that was in response to a hypothetical that did not accurately portray her impairments.[14] Specifically, Plaintiff points out that the VE stated that work would be precluded if she needed frequent rests, absences in excess of four days per month, and extreme limitations relating to attention, concentration, and performance due to chronic pain, fatigue, and side-effects from her medication.[15] Recently, the Sixth Circuit has clarified what a hypothetical should include:

> In Foster v. Halter, 279 F.3d 348 (6th Cir. 2001), we stated that a hypothetical question need only reference all of a claimant's limitations, without reference to the claimant's medical conditions. Foster, 279 F.3d at 356. In Varley v. Sec'y of Health and Human Servs., 820 F.2d 777 (6th Cir. 1987), a case cited in Howard, we likewise determined that a vocational expert need only "take[ ] into account plaintiff's limitations." Varley, 820 F.2d at 780.

---

[14]Plaintiff's Brief at page 23.

[15]Id.

18

Webb v. Comm'r of Soc. Sec., 368 F.3d 629, 633 (6th Cir. 2004). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." Casey v. Sec'y of Health and Human Servs., 987 F.2d 1230, 1235 (6th Cir. 1993) (citations omitted).

As in Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 247 (6th Cir. 1987),

[t]he vocational expert merely responded to several hypothetical questions which presumed different physical restrictions allegedly placed on claimant. The vocational expert did not determine what restrictions claimant in fact had. Rather, it was the ALJ's function to first determine what medical restrictions claimant was under and how they affected his residual functional capacity, and then to determine whether the vocational expert had identified a significant number of jobs in a relevant market given these restrictions.

See also, Stanley v. Sec'y of Health and Human Servs., 39 F.3d 115, 118-19 (6th Cir. 1994) ("the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals" (citation omitted)).

Further, [t]he "ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference," and should not be disturbed. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir.1997) (citation omitted). However, it is impossible for the undersigned to assess whether the ALJ's decision was supported by substantial evidence because he did not discuss his evaluation of her alleged fatigue, which is supported by treatment notes, within his credibility determination. The VE testified that a need to rest frequently would preclude work. (TR 207). Thus, in order for meaningful appellate review, the ALJ needs to explain his rejection of Plaintiff's need to rest in an articulate and clear manner.

3.      **Remand Versus Benefits**

The remaining issue is whether remand or an award of benefits is the appropriate remedy for Plaintiff.  It is firmly established that under § 405(g), a court immediately award of benefits "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." <u>Faucher v. Sec'y of Health & Human Servs.</u>, 17 F.3d 171, 176 (6th Cir. 1994) (citations omitted).  More specifically, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." <u>Id.</u> (citing <u>Mowery v. Heckler</u>, 771 F.2d 966, 973 (6th Cir. 1985)).

Unfortunately, the ALJ's adverse decision was devoid of substantial evidentiary support because he failed to properly analyze several factors, including Plaintiff's treating physician's opinion and whether Plaintiff's alleged fatigue was credible.  The ALJ's assessment of the VE testimony was also flawed as it relates to her alleged fatigue and the related credibility analysis.  Therefore, an award of benefits would be premature at this time.

## III.    CONCLUSION

For the reasons stated, I respectfully recommend that the court **GRANT** Plaintiff's Motion for Summary Judgment **IN PART**, **DENY** Defendant's Motion for Summary Judgment, and **REMAND** this case to the Defendant Commissioner for further proceedings consistent with this Report.

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation, they may serve and file specific, written objections within ten days after being served with a copy thereof.  The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals.  <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

20

In accordance with the provisions of Fed. R. Civ. P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.


s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**Date:** August 9, 2006

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**CERTIFICATE OF SERVICE**

I hereby certify that on <u>August 9, 2006</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: <u>Janet L. Parker</u>,

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Lisa A. Welton, P.O. Box 186, Southfield, MI 483037-0186; Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606</u>.

<u>s/James P. Peltier</u>
United States District Court
Flint, Michigan 48502
810-341-7850
E-mail: pete_peltier@mied.uscourts.gov